2010 Ark. App. 407

James **HERRINGTON; Sharon Whorton, Administratrix of the Estate of Bridgette Millsap, Deceased; Bonnie Fox; Tracy Dillard, Guardian and Next Friend of Casey Wright, A Minor; Elizabeth Baker, Individually and as Next Friend of Katlyn Baker, A Minor; Tammy French, Guardian and Next Friend of Kyla Sexson, A Minor; First Security Bancorp, Administrator of the Estate of Anne Cripps, Deceased; Tamhra Shawver, Guardian and Next Friend of Fallon Jade Shawver; Mike Walker, Individually and as Guardian of Ryan Walker, Appellants**

v.

**FORD MOTOR COMPANY, INC., Appellee.**

No. CA 08–624.

Court of Appeals of Arkansas.

May 12, 2010.

Phillip J. Duncan, James Henry Bartolomei III, Duncan Firm, P.A., Little Rock, AR, Brain G. Brooks, Attorney at Law, PLLC, Greenbrier, AR, for appellant.

Edwin L. Lowther, Jr., Wright, Lindsey & Jennings LLP, Little Rock, AR, Robert W. Powell, Allyson A. Miller, Dickinson Wright PLLC, Detroit, MI, for appellee.

JOHN MAUZY PITTMAN, Judge.

This appeal arises from a lawsuit against appellee Ford Motor Co. over the handling, stability, and crashworthiness of a 1987 van that rolled over on a Kansas highway in 2003. The accident killed two persons and injured nine. The injured parties (or their guardians) and the administrators of the two decedents' estates are the appellants herein, and they sued Ford in 2004 on theories of products liability, negligence, failure to warn, and breach of warranty. The circuit court bifurcated the liability and damage issues, and Ford won the liability phase after a lengthy jury trial. Appellants moved for a new trial, which the circuit court denied, and this appeal followed. Appellants argue that the circuit court erred in 1) seating biased jurors; 2) excluding certain evidence during appellants' cross-examination of Ford's expert witness; and 3) instructing the jury with improper verdict interrogatories. We find no merit in these arguments and affirm the denial of the new trial.[1]

## I. *Background facts*

Because appellants do not argue a lack of substantial evidence to support the jury's verdict, we offer only a brief summary of the facts. On March 15, 2003, members of the First Baptist Church in Gentry, Arkansas, were en route to Colorado for a ski trip. Nine passengers occupied a 1987 Ford van driven by Vester Cripps, and church member Bridgette Millsap occupied a vehicle following the van. At 6:24 a.m., Cripps lost control of the van on Interstate 70 in Kansas, and it rolled over, ejecting Cripps, his wife Anne, and two other passengers. Anne Cripps was killed and the other ejected passengers sustained serious injuries. The passengers who were not ejected also sustained injuries. Bridgette Millsap stopped to render aid at the accident scene and

---

1. We previously ordered rebriefing in this case because appellants' addendum did not contain their motion for a new trial or the brief in support. *Herrington v. Ford Motor Co.,* 2009 Ark. App. 708, 2009 WL 3460697. That omission has now been remedied.

died when she was struck by another vehicle.

On August 5, 2004, appellants sued Ford, alleging that the injuries and deaths were caused by the van's defective stability-and-handling system and its faulty occupant-protection design.[2] The case was tried first on the question of Ford's liability, and the jury found that Ford was not at fault. Appellants moved unsuccessfully for a new trial, then filed this appeal.

During the trial, issues arose over jury selection, the admissibility of another manufacturer's roll-over testing procedure, and the court's choice of verdict interrogatories. Those issues will be discussed in greater detail under the ensuing headings.

## II. *Jury selection*

Following the exercise of peremptory strikes, the court seated a jury that included Jean Wyant, Russell Hulse, Cheryl Fiser, and Matt Foggiano. Appellants argue that these jurors should have been stricken for cause because they expressed a predisposition to hold appellants to a higher burden of proof. They cite Ark.Code Ann. § 16–31–102(b) (Supp.2009) for the proposition that no person shall serve as a juror who has formed or expressed an opinion concerning the matter in controversy that may influence his judgment, or who is biased or prejudiced for or against any party.

■ Persons comprising the venire are presumed to be unbiased and qualified to serve, and the burden is on the party challenging a juror to prove actual bias. *Berry v. St. Paul Fire & Marine Insurance Co.*, 328 Ark. 553, 944 S.W.2d 838 (1997). The issue of a juror's qualifications lies within the sound discretion of the trial court and we will not reverse absent an abuse of discretion. *Id.*

During voir dire, appellants' attorney asked the potential jurors as a group, "Is there anybody on our jury panel that believes there ought to be caps on damages of some kind, limits on damages?" Venireman Gerald Baxter responded, "You can't put a price on humans," and expressed his disagreement with large damage awards in cases where accidents occurred through "nobody's fault." Mr. Baxter concluded that "there's a lot of lawyers, and they've got to make a living, and that's my theory." Appellants' attorney asked Mr. Baxter if his feelings were so strong that appellants "would have a bit of a burden to overcome those feelings in getting you to award large damages in a death case?" Baxter responded, "Yes."

The following then occurred:

COUNSEL: [S]o I have a greater burden with you than I might a person that didn't have those feelings. Is that a fair statement?

BAXTER: Yes.

COUNSEL: Okay. Who agrees with that statement?

(Several venirepersons raise their hands.)

COUNSEL: Here's what I need you to do. Those of you who raised your hand[s] and agree and feel as strongly as he does about it, tell me your names please.

(Fifteen venirepersons, including Wyant, Hulse, Fiser, and Foggiano, give their names.)

COUNSEL: Of those of you who've expressed that belief as a strong belief, how many of you would put a greater burden on me in this case to get damages as a result? Could I see a show of hands?

---

2. Appellants also sued Vester Cripps but dismissed him as a defendant after a settlement.

(Two venirepersons, Clark Bailey and Joe DeSoto, respond and give their names.)

. . . .

COUNSEL: What I'm saying is, if this is the scale, and I'm going to ask you to award what I believe a life is worth, which is very large money, [how many of you] would tilt the scale toward Ford as you sit here today. Anybody have that feeling?

(No hands are raised.)

Thereafter, appellants' attorney again questioned Mr. Baxter, who eventually stated that he would not place a higher burden on appellants because their lawsuit was "not frivolous." Counsel also made individual inquiries to more than a dozen other venirepersons regarding subjects that included damage caps, tort reform, and frivolous lawsuits. An in-camera hearing followed, in which counsel challenged "those three jurors" who said that they would "put a greater burden on me in a large personal injury case." Another of appellants' attorneys provided the judge with the names of all fifteen venirepersons who had raised their hands during the initial questioning of Mr. Baxter. However, the court remembered that "there were only two or three that said they would hold you to a higher burden." The court denied the challenge for cause at that point but stated that it would speak to the venire.

Proceedings resumed in open court and the trial judge told the potential jurors that he would instruct the jury on the burden of proof. The court reminded them that two lives had been lost and that the plaintiffs were seeking "significant damages." The court specifically asked Mr. Baxter if he was "convinced and confident" that he could follow the court's instructions on burden of proof. Mr. Baxter said that he could. The court then addressed those on the venire who had "raised their hands about a higher burden." The court asked if they could follow the court's instructions and not hold the plaintiffs to a higher burden of proof, specifically stating, "I need to know if there is anybody that can't follow those instructions?" No one responded. Appellants' counsel then thanked the court and continued to question venirepersons both individually and as a group.

When the jury was selected, it did not include Baxter, Bailey, and DeSoto—the three men who clearly expressed the possibility of holding appellants to a higher burden. The jury did include Fiser, Wyant, Hulse, and Foggiano, who raised their hands in response to appellants' initial inquiry about a higher burden but otherwise remained silent. Appellants now argue that Fiser, Wyant, Hulse, and Foggiano were predisposed to place a greater burden on them than required by law and should have been stricken for cause.

We note first that it is not at all clear that appellants challenged these four jurors for cause. During voir dire, appellants' counsel stated that he wished to challenge "those three jurors" who would place a greater burden on appellants—a description of veniremen Baxter, Bailey, and DeSoto, who did not sit on the jury. An appellant must challenge a juror for cause to preserve his argument on appeal that the juror should have been stricken. *Scott v. Central Ark. Nursing Centers., Inc.,* 101 Ark.App. 424, 278 S.W.3d 587 (2008) (citing *Willis v. State,* 334 Ark. 412, 977 S.W.2d 890 (1998)). Regardless, appellants have not demonstrated that Fiser, Wyant, Hulse, and Foggiano should have been stricken for cause. While these jurors raised their hands to indicate that they felt as strongly as Mr. Baxter about a higher burden of proof, when appellants'

counsel asked them directly "how many of you would put a greater burden on me in this case to get damages," the four jurors did not raise their hands as did other venirepersons. Nor did they raise their hands when asked if they would "tilt the scale" toward Ford. Given the jurors' lack of response to counsel's questions and their implicit indication that they would not impose a greater burden of proof on appellants, we cannot say that the circuit court abused its discretion in refusing to strike the jurors for cause based on bias.

■■ Furthermore, any potential bias was cured by the circuit court's inquiries and instructions. See Williams v. State, 347 Ark. 728, 67 S.W.3d 548 (2002). When a juror states that he or she can lay aside preconceived opinions and follow the law, a trial court may find the juror acceptable. See Spencer v. State, 348 Ark. 230, 72 S.W.3d 461 (2002); Berry v. St. Paul Fire & Marine Insurance Co., supra. In particular, a juror who holds a mistaken view of the law as to a defense, a particular principle of law, the burden of proof, the presumption of innocence, or the weight or effect of the evidence but is willing to abide by the law as explained or stated by the court and not by his own ideas, is not disqualified for cause. Taylor v. State, 334 Ark. 339, 974 S.W.2d 454 (1998) (emphasis added). Here, the court was careful to assure that the potential jurors could follow the law regarding burden of proof.

Appellants argue, however, that the circuit court's attempt to cure the jurors' bias was insufficient and that the court should have allowed appellants to question each person individually who had raised a hand during the initial voir dire. However, the record does not reveal an explicit request by appellants to pose individual questions to those persons nor an express objection to the court's addressing the venire as a group. Further, the record shows that appellants' counsel had the opportunity to examine several venirepersons individually during voir dire but did not make inquiries of those jurors now challenged on appeal. For these reasons, and in light of the circuit court's discretion in controlling the scope and extent of voir dire, Isom v. State, 356 Ark. 156, 148 S.W.3d 257 (2004), we find no basis for reversal.

### III. Exclusion of evidence

Appellants' expert, Dr. Mariusz Ziejewski, testified to what appellants' counsel referred to as "crashworthiness" issues involving passenger containment and the structural integrity of a vehicle during a rollover. Dr. Ziejewski stated that deformation of a vehicle's roof should not be expected. He cited off-road and racing vehicles, and declared, "Don't tell me that we engineers cannot build something that doesn't deform." Ford's counsel asked Dr. Ziejewski, "Should we build up to NAS-CAR specifications?" The doctor replied that it was not necessary to go that far.

Later, during the testimony of Ford's expert, Larry Ragan, Ford introduced three pictures of a NASCAR vehicle with roll cages so that Ragan could comment on the feasibility of designing a passenger car like a racing vehicle. Afterward, during appellants' cross-examination, Ragan stated that rollover crash testing was not part of Ford's protocol because such tests were not repeatable and therefore "not suitable to use for design evaluation." The following then occurred:

APPELLANTS' COUNSEL: There are auto companies that believe you can actually roll over vehicles and learn much about protecting people in those tests?

RAGAN: No, sir, there aren't really any. As a matter of fact, I shouldn't—

COUNSEL: Doesn't Volvo do rollover testing of their vehicles, sir?

RAGAN: They have done some of that in recent years I've seen.

COUNSEL: The XE90, for instance, they were able to establish that it could be rolled over and not knock out the windows and not crush the roof; is that a fair—

FORD'S COUNSEL: I'm going to object at this time. We're getting way outside the time frame involved here. The XE90 he's referring to is a 2003 vehicle.

APPELLANTS' COUNSEL: Direct impeachment. He said it couldn't be done, Your Honor, it couldn't be repeated. The fact that it's being done is—

COURT: You can ask him if they're doing it, but as far as any details and what happens, I'm going to sustain his objection.

APPELLANTS' COUNSEL: Now, for many years, going all the way back in the 70s, Volvo did rollover ramp testing of their vehicles for various reasons, didn't they?

RAGAN: I'm not familiar with any Volvo testing in the 70s, 60s, that sort of thing at all.

Appellants argue on appeal that the circuit court prematurely stopped their cross-examination of Ragan and improperly excluded evidence of roof-crush tests conducted on Volvo automobiles after allowing Ford to introduce pictures of NASCAR vehicles. We will not reverse a circuit court's evidentiary ruling unless the court abused its discretion. See *Gailey v. Allstate Insurance Co.*, 362 Ark. 568, 210 S.W.3d 40 (2005). We find no abuse of discretion here.

Ford introduced the NASCAR photographs in response to Dr. Ziejewski's references to off-road and racing vehicles. Appellants then pursued a different line of questioning when cross-examining Ragan by asking him about rollover testing conducted by other automobile manufacturers. When Ragan denied that such tests were conducted, appellants confronted him with Volvo's rollover testing to demonstrate, in their own words, that such testing was "being done." Ragan admitted that Volvo did some rollover testing in recent years. Thus, appellants successfully impeached Ragan, which was the goal of their questioning. Under these circumstances, it is difficult to understand how appellants were prejudiced by the court's ruling. *See Schmidt v. Stearman*, 98 Ark.App. 167, 253 S.W.3d 35 (2007) (holding that we will not reverse a circuit court's evidentiary ruling without a demonstration of prejudice). Neither the details of Volvo's recent tests nor the details of earlier testing, with which Ragan was not familiar, would have added anything significant to the impeachment that was already accomplished. Furthermore, the scope and extent of cross-examination lies within the circuit court's discretion. *See Mikel v. Development Co.*, 269 Ark. 365, 602 S.W.2d 630 (1980).

### IV. *Verdict interrogatories*

Appellants' remaining arguments concern two verdict interrogatories given to the jury at the close of the liability phase. The first interrogatory asked the jury to decide the question of Ford's fault with regard to the van's handling and stability. It read as follows:

> *Interrogatory No. 1.* Do you find by a preponderance of the evidence that there was fault on the part of Ford Motor Company with respect to handling and stability of the 1987 Econoline E250 which was the proximate cause of any damages [that plaintiffs] may have sustained?

The second interrogatory involved Ford's fault with respect to the van's crashworthiness, and it referenced only those plaintiffs who had been ejected from the vehicle. It read:

*Interrogatory No. 2.* Do you find by a preponderance of the evidence that there was fault on the part of Ford Motor Company with respect to the crashworthiness of the 1987 Econoline E250 which was the proximate cause of any damages [that the ejected plaintiffs] may have sustained?

The jury answered both interrogatories in the negative.

■ Appellants argue first that, because the trial was bifurcated and the issue of damages had yet to be tried, the interrogatories should not have asked the jurors if Ford's conduct was "the proximate cause of any damages." They claim that the jury was bound to answer the interrogatories in the negative because it had heard no evidence of damages. We conclude that appellants' argument is procedurally barred. Appellants complained during the trial that the court should not separate the handling/stability and crashworthiness claims into two interrogatories. But it was not until their motion for a new trial that they challenged the interrogatories' encroachment on the damages issue. We do not consider arguments that are raised for the first time in a motion for a new trial. *Cochran v. Bentley*, 369 Ark. 159, 251 S.W.3d 253 (2007). Moreover, appellants proffered a verdict interrogatory to the court that likewise asked the jury to determine if Ford's fault was a proximate cause of any damages. An appellant may not encourage or acquiesce in the circuit court's actions and then challenge those actions on appeal. *See Narup v. Narup,* 75 Ark.App. 217, 57 S.W.3d 224 (2001).[3]

■ Appellants argue next that the term "crashworthiness" in the second in-terrogatory confused the jury and that when the jury asked for a definition during deliberations, the court gave an instruction that contained even more confusing and technical terms. However, appellants did not object to the interrogatory on these grounds until their motion for new trial. *See Cochran v. Bentley, supra.* Moreover, appellants participated in and agreed to the court's instructing the jury with the definition of crashworthiness and objected only that the court was utilizing two verdict interrogatories instead of one. We therefore find no grounds for reversal.[4]

■ Appellants also failed to preserve their final argument regarding the interrogatories. They claim that the segregation of the ejected plaintiffs into the crashworthiness interrogatory (Interrogatory # 2) granted Ford a "back-door directed verdict" against the non-ejected plaintiffs. However, during trial, Ford moved for a directed verdict on the crashworthiness issue with regard to the non-ejected plaintiffs. The court stated, "Well, in essence I'm granting it by means of the interrogatories that I'm going to give." The record does not reflect a contemporaneous objection by appellants or an argument as to why the directed verdict should not be granted. An appellant waives an argument on appeal by failing to object at the first opportunity. *Swink v. Lasiter Construction, Inc.,* 94 Ark.App. 262, 229 S.W.3d 553 (2006).

Affirmed.

HART and BAKER, JJ., agree.

---

3.  As a matter of interest, we observe that the jury was informed on several occasions that the question of Ford's liability would be tried first, to be followed by a trial on damages.

4.  Appellants also make a brief argument that the term "handling and stability" as used in Interrogatory # 1 was confusing to the jury. We reject that argument for the same reasons as the crashworthiness argument.